**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 1:16-CV-01488-RPM

KEITH GIBSON,

      Plaintiff,

v.

COLORADO DEPARTMENT OF CORRECTIONS;
CITY AND COUNTY OF DENVER, COLORADO;
SGT. JASON ELIZARDO, individually;
SGT. DAVID HUGHES, individually;
TRUDY SICOTTE, individually; and
JOHN DOES 1-10, individually,

      Defendants.

---

**SECOND AMENDED COMPLAINT AND JURY DEMAND**

---

      Plaintiff, Keith Gibson, by and through his attorneys, David Lane and Michael Fairhurst

of KILLMER, LANE & NEWMAN, LLP, hereby brings this Complaint and alleges as follows:

## I.      INTRODUCTION

      1.      Mr. Gibson has a diagnosed seizure disorder, and repeatedly and clearly

communicated to the Defendants at the Denver County Jail and Fremont Correctional Facility

that he has a seizure disorder and that, as a result of this medical condition, he cannot be assigned

to a cell on an upper-level floor, and cannot be assigned to a top bunk. Mr. Gibson's medical

records that were in the custody of these Defendants contained the same clear directions from his

doctors.

      2.      Yet, agents of Defendant City and County of Denver ("Denver") affirmatively

and deliberately increased and enhanced the danger to which Mr. Gibson was exposed by

assigning him to a third-floor cell despite his known seizure disorder and associated bottom-tier restrictions. Mr. Gibson had a seizure in July 2014 while starting to descend the stairs the Denver Defendants had illegally forced him to descend, tumbled over the staircase railing to the concrete floor several feet below, and suffered serious injuries as a result of the fall.

3.      Mr. Gibson transferred to Fremont Correctional Facility in late 2014. The Defendants there also affirmatively and deliberately increased and enhanced the danger to which Mr. Gibson was exposed by assigning him to a top bunk despite his known seizure disorder and associated bottom-bunk restrictions. Mr. Gibson had a seizure in November 2014 while lying on the top bunk Defendants had illegally forced him to sleep on, tumbled down to the hard floor below, and suffered serious injuries as a result of the fall.

4.      Plaintiff Gibson brings legal claims under 42 U.S.C. § 1983, the Americans with Disabilities Act of 1990, as amended ("ADA"), and the Rehabilitation Act of 1973, as amended, against two sets of Defendants: the City and County of Denver and its agents who violated his rights at the Denver County Jail, and the Colorado Department of Corrections and its agents who violated his rights at the Fremont Correctional Facility. Mr. Gibson seeks damages and other relief.

## II.      JURISDICTION AND VENUE

5.      This action arises under the Constitution and laws of the United States.

6.      Jurisdiction is conferred on this Court pursuant to 28 U.S.C. §§ 1331 and 1367, 29 U.S.C. § 626(c)(1), and 28 U.S.C. §§ 1367(a) and 2201. Jurisdiction supporting Plaintiff's claim for attorneys' fees and costs is conferred by 42 U.S.C. § 1988, and other relevant law.

7.      Venue is proper in the District of Colorado pursuant to 28 U.S.C. § 1391(b). All of the events alleged herein occurred within the State of Colorado, and all of the parties were

residents of the State at the time of the events giving rise to this litigation.

## III.     PARTIES

**Plaintiff**:

8.      At all times relevant to the subject matter of this litigation, Plaintiff Keith Gibson was a citizen of the United States and a resident of Colorado. Mr. Gibson is no longer incarcerated; therefore, no administrative or other exhaustion requirements apply to any of the legal claims asserted herein. Mr. Gibson has not been incarcerated since approximately February 2015.

**Defendants**:

9.      At all relevant times to the subject matter of this litigation, Defendant Colorado Department of Corrections ("CDOC") was responsible for the hiring, training, supervision, and discipline of its employees and agents, and for its policies, customs, and actual practices challenged herein. At all relevant times, Defendant CDOC had a non-delegable duty to adequately protect, and to provide adequate medical care to, the inmates in its custody, including Mr. Gibson. CDOC is an agency and arm of the State of Colorado. All personnel who are alleged to have violated Mr. Gibson's rights at Fremont County Correctional Facility in November 2014 were agents of Defendant CDOC.

10.     Defendant City and County of Denver ("Denver") is a Colorado municipal corporation. Denver's Department of Safety is responsible for the oversight, supervision, and training of both the Denver Police Department and the Denver Sheriff's Department. At all relevant times to the subject matter of this litigation, all the personnel at the Denver County Jail who are alleged to have violated Mr. Gibson's rights were agents of Denver. At all relevant times to the subject matter of this litigation, Defendant Denver was responsible for the hiring, training,

supervision, and discipline of its employees/agents, and for its policies, customs, and actual practices challenged herein. The Denver County Jail is operated by the Denver Sheriff's Department. At all relevant times, Defendant Denver had a non-delegable duty to adequately protect, and to provide adequate medical care to, the inmates in its custody, including Mr. Gibson.

11.     At all times relevant to the subject matter of this litigation, Defendant Sgt. Jason Elizardo was a citizen of the United States and a resident of Colorado. At all relevant times, Defendant Elizardo was acting under color of state law in his capacity as a Sergeant employed by the Colorado Department of Corrections at Fremont Correctional Facility. Defendant Elizardo was acting within the course and scope of his employment with the CDOC and as an agent of the CDOC at all relevant times.

12.     At all times relevant to the subject matter of this litigation, Defendant Sgt. David Hughes was a citizen of the United States and a resident of Colorado. At all relevant times, Defendant Hughes was acting under color of state law in his capacity as a Sergeant employed by the Colorado Department of Corrections at Fremont Correctional Facility. Defendant Hughes was acting within the course and scope of his employment with the CDOC and as an agent of the CDOC at all relevant times.

13.     At all times relevant to the subject matter of this litigation, Defendant Trudy Sicotte was a citizen of the United States and a resident of Colorado. At all relevant times, Defendant Sicotte was acting under color of state law in her capacity as a medical provider (her exact title is unknown to Plaintiff at this time) who acted as an agent of the Colorado Department of Corrections at Fremont Correctional Facility. Defendant Sicotte was acting within the course and scope of her employment as an agent of the CDOC at all relevant times.

14.     Defendants John Does 1-10 are, upon information and belief, residents of and domiciled in the State of Colorado. John Doe Defendants 1-10 are the Denver County Sheriff's Department personnel who worked at the Denver County Jail during the pertinent times described herein who were involved in the interactions with Plaintiff which are alleged to have violated his constitutional and statutory rights, **or** the Colorado Department of Corrections personnel who worked at Fremont Correctional Facility during the pertinent times described herein who were involved in the interactions with Plaintiff which are alleged to have violated his constitutional and statutory rights. The identities of these John Doe Defendants is not currently known to Plaintiff, nor is the information within Plaintiff's possession or control, but is known to Defendants and within the exclusive possession and control of Defendants. Counsel for Plaintiff has submitted public records requests to the Colorado Department of Corrections and City and County of Denver relating to the identities of all the individual Defendants, and also has requested information concerning the identities of all the individual Defendants from counsel for the City and County of Denver and the State of Colorado Attorney General's office but, as of the filing of this Complaint, has not been provided with information sufficient to identify the John Doe Defendants who were at the Denver County Jail from Denver, and has been given what may be incomplete information from the State of Colorado. Plaintiff expressly reserves the right seek leave to amend this complaint to specifically identify these Defendants upon receipt of information sufficient to identify these personnel.

## IV.     FACTUAL ALLEGATIONS

### Mr. Gibson was and is disabled as a result of his epilepsy, and related impairments and conditions

15.     Mr. Gibson had epilepsy at all relevant times.

16.     At all relevant times, Mr. Gibson's epilepsy (and related impairments and conditions) – and his associated frequent, violent, and unpredictable seizures – substantially limited his major life activities, including but not limited to walking, sleeping, thinking, and concentrating.

17.     At all relevant times, Mr. Gibson had a disability as defined by the ADA as a result of his seizure disorder because he had "a physical or mental impairment that substantially limits one or more of the major life activities," "a record of such an impairment," and was "being regarded as having such an impairment." For similar reasons, Mr. Gibson also had a disability as defined by the Rehabilitation Act at all relevant times.

**The Denver County Jail Defendants affirmatively placed Mr. Gibson in harm's way by improperly assigning him to a third-floor cell.**

18.     Mr. Gibson was detained in the Denver County Jail (the "Jail") at various times from 2011-2014, including in July 2014.

19.     Before and during early July 2014, Mr. Gibson repeatedly stated to the guards and medical staff who interacted with him at the Jail that he had epilepsy, and that he can and often does have seizures because of this medical condition/disability.

20.     Before and during early July 2014, Mr. Gibson repeatedly asserted to the guards and medical staff who interacted with him that he is bottom bunk and bottom tier restricted as a result of his seizure disorder/disability, per the orders of his physicians. He clearly explained that these restrictions are necessary to minimize the risk of injury if he falls during a seizure.

21.     Mr. Gibson's medical file that was in the Jail's custody at all relevant times documented his seizure disorder/disability in multiple locations; it also contained unambiguous doctor's orders that he must be bottom tier/bottom bunk restricted at all times. This includes medical notes dated July 2010, August 2011, May 2013, June 2013, and July 2014. Defendant

Denver and its involved personnel had notice of Mr. Gibson's epilepsy and his doctor-ordered bottom tier restrictions at all relevant times.

22.     Despite being bottom tier restricted and clearly and repeatedly communicating that to all involved Jail personnel (including Defendants at the Jail) before and during July 2014, Mr. Gibson was assigned to the third floor at the Jail. In so doing, the State – here, Denver (and other individual Defendants at the Jail) – deliberately and affirmatively created and enhanced a serious danger for Mr. Gibson that would not have otherwise existed, despite being aware of the danger presented, of his medical condition/disability (epilepsy) and his associated proclivity for having violent seizures, and that assigning him to an upper-level tier violated his doctors' orders.

23.     Accommodating Mr. Gibson's disabilities by allowing him to occupy a cell on the bottom tier of the Jail would not have created an undue burden for the Jail at any time. This request was reasonable and feasible, and Mr. Gibson did not present a notable safety or flight risk. There was no other even arguably valid reason for Denver and its involved personnel to refuse to assign Mr. Gibson to a bottom tier either.

24.     Mr. Gibson had multiple seizures while in the Jail's custody. His proclivity for suffering seizures and his associated doctor's orders were common knowledge among guards and medical staff at all relevant times. All Defendants were therefore aware of his seizure disorder/disability and physician-ordered bottom bunk/bottom tier restrictions at all relevant times.

15.25.     On or about August 23, 2011, Mr. Gibson had a seizure in his cell.

16.26.     On or about July 5, 2014, Mr. Gibson had another seizure, this time while walking down the stairs from the third floor of the Jail. Mr. Gibson was on the third floor at the time

because Jail personnel (including Defendants) had deliberately disregarded medical orders that he be housed on the bottom floor by assigning him to a third-floor cell.

25.27. As a result of his seizure, Mr. Gibson careened over the staircase railing head-first to the hard floor below, from a height of about 10-12 feet.

26.28. This fall caused Mr. Gibson to suffer serious emotional and physical injuries and severe pain, including but not limited to possible brain trauma, nearly breaking his neck, and significantly injuring his hip and spine.

17.29. Mr. Gibson was transported by ambulance to Denver Health to treat his injuries stemming from the fall.

27.30. Mr. Gibson's fall was preventable. *But for* the decisions of Jail personnel (including Defendants at the Jail) to deliberately disregard the orders of Mr. Gibson's doctors that he remain on the bottom tier of the Jail at all times, and to deliberately disregard the limitations imposed by Mr. Gibson's known medical condition/disability (epilepsy), Mr. Gibson would not have tumbled over the staircase to the hard floor several feet below. The involved personnel (including Defendants at the Jail) instead intentionally and knowingly placed Mr. Gibson in harm's way by affirmatively choosing to ignore the demands of Mr. Gibson himself and medical care professionals, and by affirmatively refusing to reasonably accommodate his known seizure disorder/disability.

28.31. It was obvious to laypeople and medical care professionals alike that requiring someone with a known seizure disorder/disability (like Mr. Gibson) to frequently walk near approximately-waist high railings that cordoned off upper and lower-level floors (as Mr. Gibson had to do) and walk down flights of stairs multiple times per day (as Mr. Gibson had to do)

would create a serious danger for them – and the orders of Mr. Gibson's physicians had stated as much.

29.32. Thus, Mr. Gibson's fall and resulting injuries in July 2014 were a foreseeable and natural consequence of the Denver Defendants' intentional and affirmative decisions to increase and enhance the dangers to which Mr. Gibson was exposed by assigning him to a third-floor cell, and their intentional and affirmative decisions to fail to reasonably accommodate Mr. Gibson's known disability (epilepsy), and to instead intentionally discriminate against him based on known disability (epilepsy), by unnecessarily exposing him to grave dangers that his similarly situated inmates without epilepsy were not exposed to.

18.33. Indeed, mere days before Mr. Gibson tumbled down the stairs, on or about July 2, 2014, a medical alert was dispersed throughout the Jail stating that Mr. Gibson needs bottom bunk and bottom tier restrictions for the duration of his detention there.

**The CDOC Defendants also affirmatively placed Mr. Gibson in harm's way by improperly assigning him to a top bunk at Fremont Correctional Facility.**

30.34. During the later months of 2014, Mr. Gibson was transferred to the Fremont Correctional Facility, which was operated by the CDOC. Before having any seizure there, Mr. Gibson asserted to the guards and medical staff who interacted with him (including John Doe Defendants and Defendants Elizardo, Hughes, and Sicotte) that he has epilepsy. He further asserted to each and every one of them that he is bottom bunk and bottom tier restricted because of his seizure disorder, per the orders of his physicians. He explained to each and every Defendant there that this is medically necessary in order to minimize the risk of injury if he falls during a seizure. Mr. Gibson's medical records that were in CDOC's custody at all relevant times contained this same information and doctor's orders relating to his seizure disorder. All the

Defendants (including John Doe Defendants and Defendants Elizardo, Hughes, and Sicotte) were on notice about these doctor's orders in Mr. Gibson's medical records at all relevant times.

~~31.~~35. All involved CDOC personnel (including Defendants Elizardo, Hughes, and Sicotte) were therefore aware of Mr. Gibson's seizure-related disability and associated bottom bunk restrictions at all relevant times.

~~32.~~36. However, CDOC personnel (including Defendants Elizardo, Hughes, and Sicotte) intentionally failed to reasonably accommodate Mr. Gibson's known medical condition/disability (epilepsy). CDOC personnel (including Defendants Elizardo, Hughes, and Sicotte) instead affirmatively created a danger for Mr. Gibson that would not have otherwise existed by ordering him to sleep on a top bunk, despite knowing that he was bottom-bunk restricted for medical reasons per the orders of his physicians, and was likely to fall and potentially severely injure himself if he had to sleep on a top bunk.

~~33.~~37. Accommodating Mr. Gibson's known disability (epilepsy) merely by assigning him to a bottom bunk and tier would not have presented an undue burden to CDOC at any time. It was an entirely practicable request.

~~34.~~38. Mr. Gibson had a seizure on or about November 14, 2014 while lying on the top bunk the involved Defendants had improperly forced him to use despite his known bottom bunk restrictions and known related medical condition/disability (epilepsy), and he fell from the top bunk to the hard ground below as a result. Mr. Gibson's fall was a foreseeable and natural consequence of the CDOC Defendants' (including Defendants Elizardo, Hughes, and Sicotte) affirmative and intentional decisions to create and enhance the danger to which Mr. Gibson was exposed by choosing to disregard his doctor's orders (and the limitations imposed by his known medical condition/disability) and assign him to a top bunk.

35.39.  Each Defendant at CDOC personally participated in the assignment of Mr. Gibson to a top bunk by intentionally causing him to be assigned to a top bunk despite being aware of his epilepsy and his associated doctor's orders mandating that he be assigned to a bottom bunk at all times.

36.40.  It was obvious to laypeople and medical care professionals alike that requiring someone with a known seizure disorder/disability (like Mr. Gibson) to sleep on a top bunk day after day (as Mr. Gibson had to do) would create a serious danger for them, and the orders of Mr. Gibson's physicians in the CDOC's custody stated as much.

37.41.  Falling from the top bunk to the hard floor below foreseeably caused Mr. Gibson to suffer serious physical and emotional injuries and severe pain, including but not limited to possible brain trauma due to banging his head, knocking out teeth, and nearly biting off his tongue.

38.42.  Defendant Sgt. Elizardo is believed to have participated personally interacted with Mr. Gibson in early November 2014, starting on or about November 6, 2014, in the orientation unit. Before Mr. Gibson fell from the top bunk, he clearly told Defendant Elizardo that he had epilepsy, suffered frequent seizures, and had to be assigned to a bottom bunk at all times, per the orders of his doctors. Defendant Elizardo also has actual or constructive notice of Mr. Gibson's bottom bunk restrictions that were in his medical records in CDOC's custody at all relevant times.

39.43.  Defendant Elizardo had the ability, authority, and responsibility to ensure that Mr. Gibson was assigned to a bottom bunk at all relevant times. Defendant Elizardo had this ability, authority, and responsibility because, among other reasons, he could – and was required to – promptly and accurately transmit the detailed information Mr. Gibson had conveyed to him

regarding his medically-necessary bottom bunk restrictions (along with Mr. Gibson's unequivocal requests to be assigned to a bottom bunk) to medical personnel and other decision makers at the prison.

40.44.  However, Defendant Elizardo deliberately failed to accurately or timely transmit Mr. Gibson's requests to be assigned to a bottom bunk, and the related medical information that Mr. Gibson had repeatedly and thoroughly conveyed to him, including the fact he had epilepsy and suffered frequent and severe seizures as a result, to any of the appropriate personnel at the prison at any relevant time. Elizardo instead caused Mr. Gibson to be assigned to a top bunk despite being aware of Mr. Gibson's doctor-ordered, medically-necessary bottom bunk restrictions, and persisted in his deliberate indifference to the danger he was creating for Mr. Gibson at all relevant times by intentionally taking no action whatsoever to even attempt to cause Mr. Gibson to be assigned to a lower bunk.

41.45.  Defendant Sgt. Hughes was assigned to Mr. Gibson's living unit (after Mr. Gibson transferred from the orientation unit) at the Fremont Correctional Facility and personally made the cell assignments there, including Mr. Gibson's cell assignment, at all relevant times.

42.46.  Defendant Hughes had the ability, authority, and responsibility to ensure that Mr. Gibson was assigned to a bottom bunk at all relevant times. Defendant Hughes had this ability, authority, and responsibility because, among other reasons, he could – and was required to – promptly and accurately transmit the detailed information Mr. Gibson had conveyed to him regarding his medically-necessary bottom bunk restrictions (along with Mr. Gibson's unequivocal requests to be assigned to a bottom bunk) to medical personnel and other decision makers at the prison.

43.47.  However, Defendant Hughes deliberately failed to accurately or timely transmit Mr. Gibson's requests to be assigned to a bottom bunk (before he fell from the top bunk), and the related medical information that Mr. Gibson had repeatedly and thoroughly conveyed to him (before he fell from the top bunk), including the fact he had epilepsy and suffered frequent and severe seizures as a result, to any of the appropriate personnel at the prison at any relevant time. Hughes instead assigned Mr. Gibson to a top bunk despite being aware of Mr. Gibson's doctor-ordered, medically-necessary bottom bunk restrictions, and persisted in his deliberate indifference to the danger he was creating for Mr. Gibson at all relevant times by intentionally taking no action whatsoever to even attempt to cause Mr. Gibson to be assigned to a lower bunk. Mr. Gibson had the seizure in November 2014 and fell from the top bunk as a result while in the unit where Hughes was staffed – and in the unit where Hughes had made the bunk assignments, including his (Mr. Gibson's) assignment.

44.48.  Defendant Sicotte was one of the medical personnel at the prison who was responsible for assigning inmates to lower bunks when medically-appropriate. As mentioned, she was, at all relevant times, fully aware of Mr. Gibson's seizure-related disability and associated bottom bunk restrictions. She also was fully aware of his doctor's orders mandating that he be assigned to a lower bunk.

45.49.  However, Defendant Sicotte acted with deliberate indifference to Mr. Gibson's medical needs and intentionally and affirmatively created a danger for him by assigning him to a top bunk at all relevant times.

46.50.  The CDOC Defendants' (including Defendants Elizardo, Hughes, and Sicotte) conduct described herein caused the serious injuries Mr. Gibson suffered when he fell off the top bunk to the hard floor below on or about November 14, 2014. *But for* the described conduct of

Defendants Elizardo, Hughes, and Sicotte, Mr. Gibson would not have fallen from the top bunk while having a seizure and, instead, at worst, would have fallen from the lower bunk while having a seizure and suffered far less serious injuries (if any) as a result. Each and every one of these Defendants could have personally prevented Mr. Gibson's fall from the top bunk from occurring by causing him to be assigned to a bottom bunk.

47.51.  Mr. Gibson's doctor, Karen Rollins, MD, asserts: "Mr. Gibson has [had] epilepsy since childhood, and should always be on the bottom bunk, never on a top bunk because this puts him at serious risk for injury if he has a seizure. As an epileptic patient, it would never have been considered safe for him in the past to be placed in a top bunk while in prison."

## STATEMENT OF CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
### 42 U.S.C. § 1983
### Eighth and Fourteenth Amendments[1]; Conditions of Confinement/Failure to Protect
### (Against All Individual Defendants)

19.52. Plaintiff hereby incorporates all other paragraphs of this Complaint as if fully set forth therein.

20.53. At all times relevant to the allegations in this Complaint, Defendants were acting under color of state law.

48.54.  Mr. Gibson was a citizen of the United States and all of the individual Defendants are persons under 42 U.S.C. § 1983.

49.55. By incarcerating Plaintiff, and thereby depriving him of his liberty, Defendants had a duty to provide, and Plaintiff had a right to receive, (1) humane conditions of confinement,

---

[1] The Fourteenth Amendment claim is brought against the Denver John Doe Defendants, to the extent Plaintiff was a pretrial detainee while in Denver's custody, and the Eighth Amendment claim is brought against the agents of CDOC sued herein (including but not limited to Elizardo, Hughes, and Sicotte), and also the Denver John Doe Defendants to the extent Plaintiff was a convicted prisoner while in Denver's custody.

(2) reasonable protection of his safety, (3) reasonable training of the institutional Defendants'
employees/agents in order to provide humane and safe conditions of confinement, and (4)
reasonable supervision of the institutional Defendants' employees/agents in order to provide
humane and safe conditions of confinement.

50.56. All Defendants knew or reasonably should have known the deliberately
disregarding Plaintiff's medically-ordered bottom bunk/bottom-tier restrictions (as they did)
posed a substantial risk of serious harm to Plaintiff's safety; yet Defendants' deliberately
disregarded that obvious, substantial risk and failed to take reasonable measures to protect
Plaintiff from that risk.

51.57. All Defendants knew of and deliberately disregarded the excessive risk to
Plaintiff's safety posed by his top bunk/top tier assignments.

52.58. All Defendants violated Plaintiff's clearly established constitutional rights.

53.59. All Defendants acted intentionally, maliciously, and/or with reckless and/or
deliberate indifference to Plaintiff's federally-protected rights.

54.60. The acts or omissions of each Defendant were the legal and proximate cause of
Mr. Gibson's injuries.

55.61. The acts and omissions of each Defendant caused Mr. Gibson damages in that he
suffered extreme physical and mental pain while he was in Defendants' custody.

**SECOND CLAIM FOR RELIEF**
**29 U.S.C. § 701, *et seq.* – Violation of the Rehabilitation Act of 1973, as Amended**
**Unlawful Discrimination**
**(Against Defendants Denver and CDOC)**

56.62. Plaintiff hereby incorporates all paragraphs of this Complaint as though fully set
forth herein.

57.63.  At all times relevant to this Complaint, Plaintiff's substantial physical impairments – and his epilepsy in particular – substantially limited a variety of major life activities. This includes but is not limited to Plaintiff having seizures that were frequent, sudden, violent, and physically and mentally incapacitating, and which necessitated his assignment to lower levels and bottom bunks at all relevant times.

58.64.  Plaintiff is an individual with a disability within the meaning of the Rehabilitation Act of 1973.

59.65.  Plaintiff was qualified to participate in the services, programs, activities, and benefits provided to residents at Defendants Denver's and CDOC's facilities within the meaning of the Rehabilitation Act of 1973,

60.66.  The institutional Defendants and their programs and activities receive – and have received at all times relevant to this Complaint – federal financial assistance as that term is used in 29 U.S.C. § 794. This includes both Defendant Denver and CDOC.

61.67.  Defendants intentionally excluded Plaintiff from participation in, intentionally denied him the benefits of, and intentionally subjected him to discrimination in programs and activities solely by reason of his disabilities in violation of 29 U.S.C. § 794 and its implementing regulations. Examples of this wrongdoing include but are not limited to Defendants' improper assignment of Plaintiff to a top tier/top bunk, and Defendants' refusal to reasonably accommodate Plaintiff's disabilities by, among other things, simply assigning him to a bottom tier and bottom bunk, as Mr. Gibson had repeatedly requested and his doctor had ordered.

62.68.  Defendants illegally, severely, and/or pervasively harassed Plaintiff because of his disabilities.

63.69.  In violating the Rehabilitation Act, Defendants acted intentionally, maliciously, and/or with reckless and/or deliberate indifference to Plaintiff's federally-protected rights.

64.70.  Inmates at the Denver County Jail and Fremont Correctional Facility frequently present with bottom bunk/bottom tier restrictions. It was and is obvious that failing to immediately accommodate such restrictions creates an unreasonable risk of serious harm to the affected inmates.

65.71.  Before, during, and after the timeframe of July 2014-November 2014, Defendants CDOC and Denver failed to properly train, supervise, and discipline their employees/agents regarding the constitutional and statutory rights of disabled persons, including but not limited to reasonably and appropriately accommodating medically-necessary bottom bunk/bottom tier restrictions. This inadequate training, supervision, and discipline resulted from a conscious or deliberate choice to follow a course of action from among various alternatives available to these Defendants.

66.72.  In light of the duties and responsibilities of personnel of Defendants CDOC and Denver – who must make decisions regarding when and how to accommodate inmates' bottom bunk/bottom tier restrictions – the need for scrutiny in hiring and specialized training, supervision and discipline regarding such decisions is so obvious, and the inadequacy of appropriate hiring, training and/or supervision is so likely to result in a violation of constitutional rights, such as those described herein, that Defendants CDOC and Denver are liable for their failure to properly hire, train, supervise, and/or discipline their subordinate employees and agents.

67.73. Such failure to properly train, supervise, and discipline was the moving force behind and proximate cause of Defendants' illegal conduct towards Plaintiff, and constitutes an unconstitutional policy, procedure, custom, and practice.

68.74. Defendants CDOC and Denver are also liable under the Rehabilitation Act for the actions of their agents challenged herein under principles of vicarious liability.

69.75. Mr. Gibson has been damaged by Defendants' unlawful conduct under the Rehabilitation Act.

70.76. The acts or omissions, including the unlawful policy, procedure, custom and/or practice described herein, were the legal and proximate cause of Mr. Gibson's damages.

**THIRD CLAIM FOR RELIEF**
**42 U.S.C. § 12132, *et seq.* – Violation of Americans with Disabilities Act of 1990, as Amended**
**Unlawful Discrimination and Failure to Reasonably Accommodate Plaintiff's Disabilities**
**(Against Defendants Denver and CDOC)**

1.77. Plaintiff hereby incorporates all other paragraphs of this Complaint as if fully set forth herein.

71.78. At all relevant times, Mr. Gibson was a person with a disability, had a record of a disability, and/or was regarded as having a disability by Defendants and other Denver County and CDOC personnel.

72.79. Correctional facilities and related institutions operated by the County of Denver and Colorado Department of Corrections are public entities as that term is used in Title II of the ADA. Thus, at all relevant times, the ADA applied to all relevant correctional facilities, jails, and related institutions where Mr. Gibson was incarcerated.

73.80. Mr. Gibson was qualified to participate in the services, programs, activities, and benefits provided to inmates in the custody of CDOC and the City and County of Denver within

the meaning of Title II of the ADA.

2.81.   Defendants discriminated against Mr. Gibson based on his disabilities and failed to reasonably accommodate his disabilities despite knowing that he suffered from a number of disabilities, including epilepsy and related impairments and conditions. This violated clearly established law under Title II of the ADA and its implementing regulations.

3.82.   Defendants had no legitimate basis for violating Mr. Gibson's rights conferred by the ADA.

4.83.   The actions of Defendants were objectively unreasonable in light of the circumstances confronting them.

74.84.   Defendants and other Denver County and CDOC personnel engaged in these actions intentionally, willfully, and wantonly.

75.85.   Inmates at the Denver County Jail and Fremont Correctional Facility frequently present with bottom bunk/bottom tier restrictions. It was and is obvious that failing to accommodate such restrictions creates an unreasonable risk of serious harm to the affected inmates.

76.86.   Before, during, and after the timeframe of July 2014-November 2014, Defendants CDOC and Denver failed to properly train, supervise, and discipline their employees/agents regarding the constitutional and statutory rights of disabled persons, including but not limited to reasonably and appropriately accommodating medically-necessary bottom bunk/bottom tier restrictions.

77.87.   This inadequate training, supervision, and discipline resulted from a conscious or deliberate choice to follow a course of action from among various alternatives available to these Defendants.

78.88.  In light of the duties and responsibilities of personnel of Defendants CDOC and Denver – who must make decisions regarding when and how to accommodate inmates' bottom bunk/bottom tier restrictions – the need for scrutiny in hiring and specialized training, supervision and discipline regarding such decisions is so obvious, and the inadequacy of appropriate hiring, training and/or supervision is so likely to result in a violation of constitutional rights, such as those described herein, that Defendants CDOC and Denver are liable for their failure to properly hire, train, supervise, and/or discipline their subordinate employees and agents.

79.89.  Defendants CDOC and Denver are also liable under the ADA for the actions of their agents challenged herein under principles of vicarious liability.

80.90.  Mr. Gibson has been damaged by Defendants' unlawful conduct under the ADA.

81.91.  The acts or omissions of Defendants and other Denver County and CDOC personnel, including the unlawful policy, procedure, custom and/or practice described herein, were the legal and proximate cause of Mr. Gibson's damages.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in their favor and against Defendants, and grant:

(a)     Appropriate relief at law and equity;

(b)     Declaratory relief and other appropriate equitable relief;

(c)     Economic losses on all claims allowed by law;

(d)     Compensatory and consequential damages, including damages for emotional distress, humiliation, loss of enjoyment of life, and other pain and suffering on all claims allowed by law in an amount to be determined at trial;

(e)     Punitive damages on all claims allowed by law and in an amount to be determined

at trial;

(f)     Attorneys' fees and the costs associated with this action, including expert witness

fees, on all claims allowed by law;

(g)     Pre- and post-judgment interest at the highest lawful rate;

(h)     Any further relief that this Court deems just and proper, and any other relief as

allowed by law.

**PLAINTIFF HEREBY DEMANDS A JURY TRIAL ON ALL ISSUES SO TRIABLE.**

Dated this 2nd day of November 2016.

KILLMER, LANE & NEWMAN, LLP

*s/ Michael Fairhurst*

_____
David A. Lane
Michael Fairhurst
KILLMER, LANE & NEWMAN, LLP
1543 Champa Street, Suite 400
Denver, Colorado 80202
(303) 571-1000
(303) 571-1001
dlane@kln-law.com
mfairhurst@kln-law.com